**UNITED STATES of America, Appellee,**

v.

**Jerry Wayne WOOLBRIGHT, Appellant.**

No. 86–2414.

United States Court of Appeals,
Eighth Circuit.

Submitted June 10, 1987.
Decided Oct. 22, 1987.

Lawrence J. Fleming, St. Louis, Mo., for appellant.

J. Bennett Clark, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before ARNOLD and WOLLMAN, Circuit Judges, and DUMBAULD *, Senior District Judge.

WOLLMAN, Circuit Judge.

Following a jury trial, Jerry Wayne Woolbright (Woolbright) was convicted of one count of possession of cocaine with intent to distribute and one count of possession of methamphetamine with intent to distribute. The district court[1] sentenced Woolbright to fifteen years' imprisonment on the cocaine count and ten years on the methamphetamine count, to run consecutively. On appeal, Woolbright argues that (1) he was unconstitutionally arrested without a warrant or probable cause, (2) the search of his luggage was not properly conducted within any of the exceptions to the fourth amendment requirement for search warrants, (3) the district court erred in admitting the testimony of a fellow arrestee who was separately tried, and (4) the district court improperly admitted testimony under Fed.R.Evid. 404(b) concerning a past drug-related arrest. We reject these contentions and affirm the judgment of conviction.

## I. FACTS

At 5:30 p.m. on May 19, 1986, a man with purple streaks in his hair and three earrings in one ear deposited the body of Amy Creeley at Christian Northwest Hospital in Florissant, Missouri, outside St. Louis. Doctors pronounced Ms. Creeley dead on arrival. The man who had delivered the body, later identified as Midnight Bobby Dolan (Dolan), left before police could question him. Florissant police suspected that the death was caused by drug overdose.

At approximately 2:30 a.m. on May 20, 1986, Detective Robert Kenney (Kenney), of the St. Louis County police, telephoned Police Officer Timothy Nisbet (Nisbet), also of the St. Louis County police, and informed him that he, Kenney, had received information that a man matching Dolan's description was in a suite of rooms on the eighth floor of the Harley Hotel in north St. Louis County. Kenney was working a second job as a Harley Hotel security guard at the time. Nisbet relayed Kenney's information to the Florissant police, who were investigating Ms. Creeley's death.

While waiting for Nisbet to arrive, Kenney positioned himself to observe the suite of rooms occupied by Dolan. Kenney observed Woolbright emerge from one of the

---

* The HONORABLE EDWARD DUMBAULD, United States Senior District Judge for the Western District of Pennsylvania, sitting by designation.

1. The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri.

rooms and check to see if the door leading to the fire escape was locked.

Nisbet and several Florissant police officers arrived at approximately 2:45 a.m., and shortly thereafter a female, later identified as Lisa Randle (Randle), exited from the room under observation. When she noticed the police in a small room off the hallway outside the room, Randle immediately attempted to reenter the room but was detained by the police. Randle, who appeared to be under the influence of drugs, made exculpatory statements to the police. Dolan (he of the purple-streaked hair) then came out of the room carrying a single piece of luggage, walked directly towards the police officers, and requested that they search his bag. The officers declined to do so. Moments later two more men emerged quickly from the same room and hurried towards the fire escape. Nisbet and Kenney identified themselves as police officers and ordered the two men to stop, but only when Kenney drew his revolver and repeated the command did the two men comply.

When the two men stopped and turned around, Nisbet recognized one of them as Woolbright from previous investigations. Woolbright was carrying four pieces of luggage and also had a large bulge in one of his pants pockets. The officers directed the two men to lie on the floor and patted them down. The bulge in Woolbright's pocket was a large sum of cash, which Woolbright claimed amounted to $3,200 but was actually $8,700. The second man identified himself as Steve Wilson (Wilson), whom the Florissant police knew to be Ms. Creeley's live-in boyfriend. Wilson was carrying a plastic bag that the officers observed was full of syringes. The officers arrested all four detainees for suspicion of the murder of Ms. Creeley and seized the bags they were carrying.

The Florissant police requested that the suspects be taken to the Florissant police station. However, because the Harley Hotel is not within the jurisdiction of the Florissant police, Nisbet conveyed the suspects to the St. Louis County Detective Bureau Building, where they arrived at approximately 4:15 a.m. Each suspect was placed in a separate room for questioning, and the luggage was placed in a locked and guarded room.

Nisbet interviewed Randle first. After being advised of her *Miranda* rights, Randle stated that she was on a "honeymoon trip" with Woolbright. Nisbet then interviewed Dolan. At about 6:00 a.m., after questioning Randle and Dolan, Nisbet approached Woolbright. Woolbright indicated that he wanted an attorney, and Nisbet did not question him. Woolbright also indicated that he was a diabetic and needed medical attention. Woolbright was taken to a hospital and was returned to the detective bureau at approximately 8:00 a.m.

At approximately that time, Nisbet, along with an Agent Crowley of the Federal Bureau of Investigation (F.B.I.), began questioning Wilson. Wilson told Nisbet the following: Ms. Creeley died of an overdose in Hazelwood, Missouri, after he had injected her with cocaine; Woolbright had supplied Wilson with cocaine; Wilson called Woolbright to help him dispose of Ms. Creeley's body; Woolbright had solicited the aid of Dolan to drop the body at the hospital in Florissant.

All interviews were concluded at approximately 10:00 a.m. Nisbet concluded that the jurisdiction of the murder was Hazelwood, not Florissant, and informed the Hazelwood police. At approximately 11:00 a.m., the St. Louis County police began processing each suspect as a "fugitive of the Hazelwood Police Department; for murder," to be transferred to the Department of Justice Services of St. Louis County for further processing and incarceration in the county jail.

At this time, Nisbet began inventorying the suspects' bags. Several hundred methamphetamine pills, more than two-hundred seventy grams of cocaine with an approximate street value of $60,000, and various drug paraphernalia, including a scale, syringes, and a ledger indicative of drug transactions, were found within the bags Woolbright was carrying. Upon this discovery, Nisbet released Woolbright to the F.B.I. for processing on federal drug charges.

Woolbright was never booked on any state charges relating to Ms. Creeley's death.

## II. PROBABLE CAUSE TO ARREST

 Both the magistrate and the district court concluded that there was probable cause to arrest Woolbright for murder. A district court's finding of probable cause to make a warrantless arrest will not be overturned unless clearly erroneous. *United States v. Wajda*, 810 F.2d 754, 758 (8th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987); *United States v. McGlynn*, 671 F.2d 1140, 1143 (8th Cir. 1982). The existence of probable cause sufficient to justify a warrantless arrest depends on "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (citations omitted) (*quoted in United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984)); *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed.2d 543 (1925) (do the facts known to the officers "warrant a man of reasonable caution" to believe an offense has been committed). When making this determination, the district court may consider the "collective knowledge and information of all of the officers involved." *United States v. Rose*, 541 F.2d 750, 756 (8th Cir.1976), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977); *United States v. Briley*, 726 F.2d 1301, 1305 (8th Cir.1984).

Police officers may draw reasonable inferences of criminal activity from circumstances that "the general public may find innocuous," *Wajda*, 810 F.2d at 758 (citation omitted); *United States v. Wallraff*, 705 F.2d 980, 990 (8th Cir.1983), particularly when they are experienced, as is Nisbet, a sixteen-year veteran with four years on homicide. *United States v. Jones*, 759 F.2d 633, 642–43 (8th Cir.) *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985).

At the time of Woolbright's arrest the totality of circumstances was as follows. Approximately ten hours earlier Ms. Creeley's dead body had been dropped at a nearby hospital by a man with purple-streaked hair and three earrings in one ear. Drug overdose was the suspected cause of death. The man with the purple hair was known to be in a room at the Harley Hotel with some others. Woolbright had emerged from the room, checked the access to fire escape, and returned. Randle had left the room, tried to return after noticing the police, but after being detained and informed that the police were investigating Ms. Creeley's death, spontaneously offered exculpatory statements about Dolan and the deceased. Dolan approached the officers and asked them to search his bag in an apparent attempt to distract the police from the activity of Woolbright and Wilson.

 Woolbright and Wilson attempted to exit quickly from the scene by the eighth floor fire escape at 3:00 a.m. carrying luggage, hardly a routine time and mode of departure. Neither responded until Kenney drew his gun and commanded them a second time to stop. Wilson was carrying a plastic bag full of syringes and was known to be Ms. Creeley's live-in boyfriend. Woolbright was carrying a large sum of cash and was known for prior involvement in drugs and as a prior homicide suspect.

As noted by the district court, Woolbright might have been reasonably believed to be involved in transporting a dead body, concealment of a crime, misprision of felony, obstructing justice, accessory to murder, or supplying the instrumentality which caused Ms. Creeley's death. Under these circumstances, we cannot find the district court's decision clearly erroneous.

Woolbright places great emphasis on *United States v. Everroad*, 704 F.2d 403 (8th Cir.1983), in which this court held that mere temporary association with a suspected criminal does not amount to probable cause to arrest. *Id.* at 406 (citations omitted). In *Everroad*, the appellant was ar-

rested solely because he was observed with persons who at other times had negotiated drug sales to undercover officers and because he lived within a relatively close proximity to the site of the transactions. *Id.* Woolbright contends that he was arrested solely because he was found accompanying Dolan. The evidence shows, however, that in addition to being with Dolan, Woolbright implicated himself by his own actions.

Furthermore, another factor important to the *Everroad* holding is absent here. In *Everroad,* "law enforcement would not have been unduly hampered * * * if the agents had waited to obtain more facts before seeking to arrest [the defendant]." *Id.* at 407. Here, the officers could not have waited. Woolbright was in the midst of a hasty 3:00 a.m. exit from the hotel, fully packed. It would have been irresponsible to have allowed Woolbright to depart after he had implicated himself in the events being investigated.

## III. INVENTORY SEARCH

█ Woolbright also challenges his conviction on the ground that the inventory search that led to the discovery of the controlled substances was not done pursuant to the standards set in *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). Specifically, Woolbright argues that the search was invalid because it occurred in a St. Louis County facility and he was not charged with a state offense, and because it was executed approximately seven hours after his arrest. We find neither argument persuasive.

Under the fourth amendment, the propriety of inventory searches is judged by the standard of reasonableness. *Colorado v. Bertine,* —— U.S. ——, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987) (distinguishing the analysis for investigatory searches in *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Rabenberg,* 766 F.2d 355, 357 (8th Cir. 1985) ("the proper standard for determining the constitutionality of * * * inventory searches is * * * reasonableness"). In *Lafayette,* the United States Supreme Court held that "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Id.* 462 U.S. at 648, 103 S.Ct. at 2611. There is no evidence that the inventory search here was not conducted pursuant to standard procedures.

Woolbright was validly arrested upon probable cause and was being routinely processed on state charges for incarceration in a state facility. St. Louis County police procedure is to inventory the belongings of every arrestee brought to the Detective Bureau Building before the arrestee is transferred for booking and incarceration. After discovering the controlled substances in Woolbright's bags, Nisbet decided to release him to the federal authorities. For this reason, the state processing was not completed. This change of plans does not render the search unreasonable or in any way indicate that the search was not undertaken pursuant to established procedure.

The fact that Woolbright had not yet been formally booked is not dispositive as long as routine procedure was being followed. "We are hardly in a position to second-guess police departments as to what practical administrative method will best deter theft by and false claims against its employees and preserve the security of the station house." *Lafayette,* 462 U.S. at 648, 103 S.Ct. at 2610. As noted by the district court, requiring the police to formally book arrestees before inventorying their belongings would benefit no one. It is reasonable, in light of the underlying rationales of inventory searches, namely, safety, deterrence of theft, and the prevention of false claims against the police, that the arrestee's belongings be inventoried at the first place the processing begins, whether or not the arrestee is ultimately booked or incarcerated there. No particular "stationhouse setting" is crucial to the validity of an inventory search. *Bertine,* 107 S.Ct. at 742; *Rabenberg,* 766 F.2d at 357.

Similarly, the elapse of approximately seven hours between the arrest and the search does not cast a shadow of impropriety over the search. Reasonableness, and not any rigid chronological formula, is the hallmark of a proper inventory search. *See Bertine*, 107 S.Ct. at 741–42 (reasonableness standard is controlling); *Lafayette*, 462 U.S. at 644, 103 S.Ct. at 2608 (inventory search is an "incidental administrative step following arrest and preceding incarceration"); *see also United States v. Edwards*, 415 U.S. 800, 804–08, 94 S.Ct. 1234, 1237–39, 39 L.Ed.2d 771 (1974) (delay of ten hours in seizing and searching arrestee's clothing not unreasonable). Here, the delay was caused by the availability of only one detective to question four suspects, Woolbright's being sent to the hospital for two hours for treatment of diabetes, and the confusion in determining the proper jurisdiction over the murder charge. There is no evidence that the delay was the result either of bad faith on the part of the police or of an investigatory search. *See Bertine*, 107 S.Ct. at 742; *Rabenberg*, 766 F.2d at 357. In short, because "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment," *Bertine*, 107 S.Ct. at 742, we find the inventory search constitutional.[2]

## IV. RANDLE'S STATEMENT

Woolbright argues that the district court erred in admitting a statement by Randle, who was not tried with Woolbright, that she and Woolbright were on a "honeymoon trip" at the time of the arrest. The district court had previously admitted, in response to Woolbright's motion, a statement by Randle identifying as hers one of the bags Woolbright was carrying. The bag that Randle identified contained the vast majority of the methamphetamine pills. Once the honeymoon statement was admitted, the government was able to benefit from a constructive possession instruction.

The district court ruled, correctly, that the identification of the bag was a statement against penal interest admissible under Fed.R.Evid. 804(b)(3). Randle had asserted her privilege against self-incrimination under the fifth amendment and therefore was unavailable under Rule 804(a)(1). The district court ruled that the honeymoon statement was admissible because, although the two statements were not made at the same time, "it would be prejudicial and unfair, [as well as] incomplete" to admit the statement concerning ownership of the bag without admitting the honeymoon statement. We conclude, however, that neither Rule 106, the rule of completeness, which is limited to writings, nor Rule 611, which allows a district judge to control the presentation of evidence as necessary to the "ascertainment of the truth," empowers a court to admit unrelated hearsay in the interest of fairness and completeness when that hearsay does not come within a defined hearsay exception. *See* Fed.R.Evid. 802.

The government argues that the honeymoon statement was admissible either under Rule 804(b)(3) or (5). Although the honeymoon statement was made by an unavailable declarant who can be presumed to have had first-hand knowledge of the subject matter of the statement, it is not "so far contrary" to the declarant's penal interest to imbue it with the requisite reliability under Rule 804(b)(3). First, it is unclear that the honeymoon statement was against Randle's penal interest at all, as mere association with Woolbright would not subject Randle to criminal liability. *See Everroad*, 704 F.2d at 406. Secondly, there is no evidence that Randle was in any manner aware that the honeymoon statement was against her penal interest. *See United States v. Pena*, 527 F.2d 1356, 1362 (5th Cir.), *cert. denied*, 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976); *Pink Supply Corp. v. Hiebert, Inc.*, 612 F.Supp. 1334, 1345 (D.Minn.1985), *aff'd* 788 F.2d 1313 (8th Cir.1986); 4 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 804(b)(3)[02], at

---

2. Because we find the inventory search proper, we do not reach the determination by the district court that the contraband was also admissible under the inevitable discovery doctrine. *See Nix v. Williams*, 467 U.S. 431, 440–48, 104 S.Ct. 2501, 2507–11, 81 L.Ed.2d 377 (1984).

804–98 (1987) (citations omitted). Awareness of exposure to penal liability can be imputed to Randle with respect to the statement concerning ownership of the bag, but not with respect to the honeymoon statement.

We now turn to Rule 804(b)(5), the "catchall" hearsay exception when the declarant is unavailable. Initially, we note that we have strictly construed the requirements of this rule. *See United States v. Love,* 592 F.2d 1022, 1026 (8th Cir.1979). "The history of Rule 804(b)(5) * * * indicates that Congress did not intend to create a broad new hearsay exception. The intent of Congress was that Rule 804(b)(5) would be used very rarely, and only in exceptional circumstances." *Id.* In addition to requiring circumstantial guarantees of trustworthiness equivalent to those delineated in the specific hearsay exceptions under Rule 804, Rule 804(b)(5) also requires that the evidence in question bears on a material fact, is "more probative on the point for which it is offered than any other evidence" reasonably available, that its admission will serve "the general purposes of these rules and the interests of justice," and that the opponent had reasonable notice of the proponent's intent to introduce the statement. Fed.R.Evid. 804(b)(5).

The government argues that the reliability of the honeymoon statement is buttressed by the following "equivalent circumstantial guarantees of trustworthiness." Randle was from out of town but was carrying no luggage when stopped by the police as she was attempting to leave the hotel. The bag that Randle claimed ownership of, and which Woolbright was carrying, contained women's clothing that most likely could only have belonged to Randle. This evidence, however, only tends to support Randle's claim of ownership. The government also points out that travel arrangements for Randle and Woolbright had been made from Denver, Randle's hometown, to St. Louis, in the name of "Mr. and Mrs. M. Frost," and that Woolbright was known to use the alias "Marc

Frost." Randle and Woolbright were apparently staying together in the same suite of rooms at the hotel, and Woolbright was carrying her bag. Lastly, Woolbright's bags contained airline tickets to and from Denver, none of which, however, were in the names of "Mr. and Mrs. Frost."

■ The government offered the honeymoon statement not to prove its literal truth, because Randle and Woolbright were not married, but to establish that they had a more than casual, informal relationship. This evidence was necessary to counter the admission into evidence of Randle's identification of one of the bags as hers and the correlative implication that Woolbright was unaware of the methamphetamines. We find that these facts, necessarily viewed in the light most favorable to the government, *United States v. Baswell,* 792 F.2d 755, 756 (8th Cir.1986); *United States v. Clark,* 743 F.2d 1255, 1259 (8th Cir.1984), coupled with the lack of evidence and sheer improbability that Randle was attempting to curry favor, exonerate herself, or implicate Woolbright by making the honeymoon statement, provide sufficient circumstantial guarantees of trustworthiness to warrant admitting that statement for the purpose of illustrating the nature of Randle and Woolbright's relationship.[3] *See United States v. Marchini,* 797 F.2d 759, 762–64 (9th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987) (grand jury testimony of witness who asserted marital privilege deemed trustworthy because uncontroverted, not inculpatory of defendant, concerned facts within witness's personal knowledge, superior to other evidence, and no apparent motive for fabrication); *United States v. Van Lufkins,* 676 F.2d 1189, 1191–92 (8th Cir.1982) (statement by assault victim to sister shortly after assault and without any evidence of fabrication admissible); *United States v. Lyon,* 567 F.2d 777, 784 (8th Cir.1977), *cert. denied,* 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978) (statement transcribed by F.B.I. agent admissible when no other

---

**3.** Although Nisbet testified that at the time of making the honeymoon statement Randle appeared to be under the influence of narcotics, the district court determined that while this could be relevant to Randle's *Miranda* waiver, it did not affect admissibility here.

evidence available and trustworthiness guaranteed by agent's "detailed testimony" concerning transcription of statement); *United States v. Ward,* 552 F.2d 1080, 1083 (5th Cir.), *cert. denied,* 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977) (self-serving statement corresponding factually to testimony of other witnesses and investigator admissible); *United States v. Carlson,* 547 F.2d 1346, 1354–55 (8th Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977) (grand jury testimony admissible at trial because made under oath, never recanted, based on first-hand knowledge, and best evidence available). *See also United States v. Bailey,* 581 F.2d 341, 350 (3d Cir.1978) (statement made in face-to-face negotiations for reduction of charge against declarant lacked trustworthiness); *Pink Supply Corp. v. Hiebert, Inc.,* 612 F.Supp. 1334, 1345–46 (D.Minn. 1985), *aff'd* 788 F.2d 1313 (8th Cir.1986) (noncontemporaneous statement without any indicia of trustworthiness not admissible).

Similarly, the other requirements of Rule 804(b)(5) are also satisfied. It is uncontroverted that the statement bears on a material fact, the element of intent required under 21 U.S.C. § 841(a)(1), possession with intent to distribute. No issue has been raised by Woolbright that he was not given adequate notice of the government's intent to offer the statement. The statement was the most probative direct evidence of the relationship between Randle and Woolbright, because Randle had become unavailable. Finally, its admission served both a purpose of the rules, i.e., the admission of relevant evidence, *see* Fed.R.Evid. 402, and the interests of justice. Therefore, we hold that the district court did not abuse its discretion in admitting the honeymoon statement under Rule 804(b)(5).

We also note that the admissibility of the honeymoon statement is not susceptible to a sixth amendment challenge.

[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred with-

out more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) (footnote omitted); *Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) ("[t]he Confrontation Clause has never been held to bar the admission into evidence of every relevant extrajudicial statement made by a nontestifying declarant simply because it in some way incriminates the defendant") (citations omitted); *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972) (confrontation clause is satisfied by unavailability of declarant and indicia of reliability of statement).

▇ Without holding that it would always be necessarily so, we find that the indicia of reliability of the honeymoon statement that passed the Rule 804(b)(5) analysis also satisfy the related but not coextensive requirements of the confrontation clause. *See United States v. Barlow,* 693 F.2d 954, 964–65 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983) (citing *Dutton v. Evans,* 400 U.S. 74, 88–89, 91 S.Ct. 210, 219–20, 27 L.Ed.2d 213 (1970)); *United States v. West,* 574 F.2d 1131, 1137–38 (4th Cir. 1978). In light of the reliability of the statement, Woolbright was not materially prejudiced by the absence of an opportunity to cross-examine Randle, *see Ellis v. Black,* 732 F.2d 650, 656 (8th Cir.1984), and in light of Woolbright's actual possession, the statement was not " 'devastating' " to him. *See Dutton,* 400 U.S. at 87, 91 S.Ct. at 219. In addition, Woolbright will not now be heard to argue that the admission of this evidence was unfair, because the government offered the honeymoon statement only after Woolbright announced his intent to offer Randle's statement concerning ownership of the bag.

## V. EVIDENCE OF PRIOR ILLEGAL CONDUCT

Woolbright's final contention is that the trial court erred in admitting, under Rule

404(b), the testimony of Deputy Sheriff Joseph McWilliams of the Los Angeles County Police Department. McWilliams testified about the circumstances surrounding his December 20, 1984, arrest of Woolbright in California for possession of cocaine.

The district court may admit evidence of past crimes or bad acts relevant to any issue at trial other than propensity. *United States v. Simons*, 767 F.2d 524, 526 (8th Cir.), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 545, 88 L.Ed.2d 474 (1985); Fed.R.Evid. 404(b). To be admissible "(1) the evidence of the bad act must be admissible on a material issue raised; (2) the evidence must be similar in kind and reasonably close to the charge at trial; (3) the evidence of the other crime or bad act must be clear and convincing; and (4) the probative value of the evidence must not be outweighed by its prejudice." *United States v. Marshall*, 683 F.2d 1212, 1215 (8th Cir.1982) (citations omitted). The district court has broad discretion under Rule 404(b). *United States v. Mays*, 822 F.2d 793, 797 (8th Cir.1987); *United States v. Paul*, 810 F.2d 774, 776 (8th Cir.1987) (citation omitted).

■ McWilliams testified that Woolbright was in possession of cocaine, ledger sheets indicative of recorded drug transactions, and was traveling under an alias when arrested. This evidence was admissible on the material issue of intent, *see* 21 U.S.C. § 841(a)(1), and relevant to refuting Woolbright's contention of mistake. *See United States v. Miller*, 725 F.2d 462, 466 (8th Cir.1984) (when "intent is an element of the crime or crimes charged, evidence of other acts tending to establish that element is generally admissible") (citation omitted); *United States v. Fuel*, 583 F.2d 978, 988–89 (8th Cir.1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979).

McWilliams' testimony concerned an offense identical in nature to the offense here and was established by clear and convincing evidence. The passage of seventeen months between the arrests, although not a short time, does not make the earlier incident inadmissible. Finally, we hold the district court did not abuse its discretion in determining that the danger of undue prejudice was outweighed by the probative value of this evidence. *See generally Paul*, 810 F.2d at 776–77; *Llach v. United States*, 739 F.2d 1322, 1327 (8th Cir.1984); Fed.R.Evid. 404(b) Advisory Committee's note subdivision (b).

McWilliams' identification of the white powder in Woolbright's possession as cocaine was properly admitted under Rule 702 based on McWilliams' experience and training. The fact that Woolbright's conviction stemming from the 1984 arrest was on appeal at the time of this trial was irrelevant to the admissibility of McWilliams' testimony. *Cf. Drummond v. United States*, 350 F.2d 983, 990 (8th Cir.1965), *cert. denied*, 384 U.S. 944, 86 S.Ct. 1469, 15 L.Ed.2d 542 (1966); *Newman v. United States*, 331 F.2d 968, 973 (8th Cir.1964), *cert. denied*, 379 U.S. 975, 85 S.Ct. 672, 13 L.Ed.2d 566 (1965); Fed.R.Evid. 609(e).

The judgment of conviction is affirmed.